**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>UNIROYAL HOLDING, INC., *et al.*,[1]<br><br>Debtors | Chapter 11<br><br>Case No. 26-[●]<br><br>Judge: [●]<br><br>(Joint Administration Requested) |

**DECLARATION OF ROBERT V. D'ANGELO, JR. IN SUPPORT**
**<u>OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>**

I, Robert V. D'Angelo, Jr., pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1. I am the President, General Counsel, and a member of the board of directors of Uniroyal Holding, Inc., a New Jersey corporation ("**Uniroyal**") and the Vice President, Secretary, and a member of the board of directors of Great Hill Corporation, a Delaware corporation, ("**Great Hill**" and, together with Uniroyal, each a "**Debtor**", and, collectively, the "**Debtors**"). Uniroyal is the direct corporate parent of Great Hill. The Debtors have their sole office in Naugatuck, Connecticut.

2. I have served as President and Secretary of Uniroyal since October 29, 2019. Prior to that, I served as Vice President and Secretary from April 22, 1999 to the date of my election as President. I have also served as General Counsel of Uniroyal since April 22, 1999. Prior to that, I served as Associate General Counsel from August 1, 1996 to the date of my election as General

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal taxpayer identification number, are: Uniroyal Holding, Inc. (8485) and Great Hill Corporation (9024). The mailing address for each Debtor for purposes of these chapter 11 cases is 70 Great Hill Road, Naugatuck, CT 06770.

Counsel. I have been a member of the Uniroyal board of directors since October 16, 2016. I was also employed as an attorney with Uniroyal and Uniroyal, Inc. ("**Inc**") from September 1984 to February 1987. I am familiar with the Debtors' day-to-day functions, books and records, financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

3. Earlier today (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"). I submit this declaration (the "**Declaration**") to support the Debtors' final disposition of assets in accordance with their corporate purpose, to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Debtors' chapter 11 cases, and to support the motions that the Debtors have filed with the Court (the "**Motions**"). I believe the relief sought in the Motions serves the best interest of the Debtors' estates, creditors, and other parties in interest.

4. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors working directly with me or under my supervision, my experience with the Debtors, and my discussions with Alvarez & Marsal, financial advisor to the Debtors, and Debevoise & Plimpton LLP, counsel to the Debtors, (collectively with Alvarez & Marsal and the Debtors' other advisors, the "**Advisors**"). If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

5. This Declaration is organized into four sections. Section I provides an overview of the Debtors and these chapter 11 cases. Section II provides background information on the Debtors' corporate history, liabilities, capital structure, and corporate governance. Section III

describes the events leading to the commencement of these chapter 11 cases. Section IV summarizes the relief requested in, and the legal and factual bases supporting, the Motions.

## I. Situation Overview

6. Uniroyal was incorporated as a wholly-owned subsidiary of Inc in 1985 as part of the acquisition and subsequent reorganization of Inc. Uniroyal's principal objectives for the last 41 years have been to provide post-employment welfare benefits, the most significant of which are medical and life insurance benefits, to certain retirees of discontinued businesses of Inc and retirees of Uniroyal (the "**Retiree Benefits Program**"), and to manage various types of litigation. The most significant litigation in terms of cost involves claims against Uniroyal that are attributable to, arise from, are based upon, relate to, or result from an alleged personal injury tort or wrongful death claim related to asbestos asserted under any legal theory, and any derivative claim arising therefrom (the "**PI/WD Claims**", and holders of such claims, "**PI/WD Claimants**"). Uniroyal has not had any operating businesses since its formation. In order to satisfy its obligations, Uniroyal manages a portfolio of financial assets which has consisted principally of cash and marketable securities. Over the last 30 years, that portfolio has earned an average rate of return annually of nearly 7%, which is particularly impressive given that Uniroyal has a constant and continuing obligation to fund benefits, litigation and operating expenses and must, therefore, invest conservatively.

7. Uniroyal has always kept its expenses to the bare minimum. It has operated out of the same leased office and storage space in a converted warehouse in Naugatuck, Connecticut for 35 years. Uniroyal currently has a total of only five employees—three full-time and two part-time. The tenure of those employees with Inc and Uniroyal ranges from 20 to over 55 years. All are past normal retirement age, ranging in age from 69 to 73. They have spent most, if not all, of their

careers at Uniroyal and possess knowledge of the company that is essential to conducting its business and would be impractical, or perhaps even impossible, to replace.

8. In the early 1990s, three unanticipated developments occurred almost simultaneously that threatened Uniroyal's continued viability. First, annual retiree medical and drug costs escalated dramatically. Second, Uniroyal's role in asbestos litigation as a minor defendant changed as asbestos plaintiff lawyers expected Uniroyal to take the place of larger and now bankrupt defendants and pay the same amount that those other defendants had been paying. Third, Uniroyal's settlement with its first-layer insurance carriers, which had largely funded its asbestos litigation costs, was running out. The escalating costs of benefits and tort litigation were challenging for Uniroyal, especially since Uniroyal had no operating businesses and could not pass on these increased costs by traditional methods such as developing new products or raising prices to customers. Operating costs were already minimal. Rather, Uniroyal had only its investment portfolio which, as described above, could only be invested conservatively and the possibility of recovery from upper layer excess insurers of Inc. As described in detail below, Uniroyal management successfully dealt with each of these three threats by making periodic adjustments to manage its obligations, leading to the current structure and mix of assets and liabilities to be resolved through these chapter 11 cases.

9. The Debtors have commenced these chapter 11 cases at this time to provide for the satisfaction of their remaining liabilities following the retirement of their employees, all in a way that will provide a fair and equitable distribution of all available assets among retirees and creditors, including both current and future PI/WD Claimants. The Debtors plan to effectuate this goal through the proposed consensual *Joint Chapter 11 Plan of Uniroyal Holding, Inc. and Great Hill Corporation* filed concurrently with this Declaration (the "**Plan**"), which provides for

(a) satisfaction in full of all non-PI/WD Claims against the Debtors; (b) the establishment of a settlement trust to assume, administer, and resolve present and future PI/WD Claims; and (c) the dissolution of the Debtors. As described below, in compliance with the applicable requirements of the Bankruptcy Code, the Debtors will seek the Court's approval of a fully consensual modification of the Retiree Benefits Program to provide the beneficiaries thereunder, as applicable, fully paid life insurance benefits and funds to purchase comparable or better individual medical and drug benefits coverage in exchange for the termination of Uniroyal's ongoing obligations under the Retiree Benefits Program.

10. Before the Petition Date, for a period of several months, the Debtors engaged in extensive negotiations on the terms of the Plan with an ad hoc group of law firms (the "**Ad Hoc Group**") representing approximately 88% of known PI/WD Claimants. Following consultation and careful examination by their management team and boards of directors, the Debtors entered into a Restructuring Support Agreement (the "**RSA**"), a copy of which is attached as **Exhibit A**, whereby the Debtors, the Ad Hoc Group, and their clients agreed to take actions necessary to seek approval of the Plan, including, as applicable, supporting and voting in favor of the Plan.

11. The Debtors also believe that this filing is timely since its employees described above will remain available to assist in an orderly wind-up process before their impending retirement.

## II. Background

### A. Corporate History

12. Inc, which was a public company, was organized in New Jersey in 1892 as the "United States Rubber Company." Its original business model was to consolidate the fragmented rubber-footwear industry by centralizing purchasing and selling and cross-plant product allocation,

and realizing economies of scale. In 1896, it was listed as one of the original 12 companies on the Dow Jones Industrial Average, trading under the ticker “R”.

13. Inc expanded rapidly through a combination of acquisitions, organic growth, and development and application of new technologies, eventually becoming a business conglomerate that included general rubber, tire, chemical, industrial-products, and synthetic-rubber enterprises. Inc also achieved backward integration into the rubber raw material supply chain by establishing rubber plantations in Sumatra and present-day Malaysia, eventually becoming one of the world’s largest natural rubber producers.

14. In the First World War, Inc was a key supplier of essential war supplies. It retooled to support the war effort, and by the end of the war, it had produced vast quantities of gas masks, rubber boots, and solid and pneumatic tires. Reporting indicates that it contributed about one-third of the 4.5 million pneumatic tires produced in the United States during that period.

15. In the Second World War, Inc played an even more vital strategic role. It was a critical producer of key wartime materials, converting its existing production facilities into munitions and ordnance supplies in support of the war effort. In addition to these activities, in order to address and compensate for the United States’ loss of access to significant portions of the world’s natural rubber supply and increased wartime demand for rubber materials, Inc was a key participant in a consortium of rubber companies that worked directly with the United States government to develop and produce a general-purpose synthetic rubber. Also, at this time, Uniroyal developed, at the request of the U.S. Navy, a patented lightweight asbestos-containing cloth. That cloth, along with rubber, was classified by the government U.S. War Production Board as a “critical” war material. Prior to its use, pipes on ships had been insulated with cotton-duck fabric, which acted like a wick in the event of a shipboard fire. Fires were a constant threat on war

ships as they threatened to engulf vessels that had limited means of fire suppression. Lightweight cloth was especially important since its use allowed for more armament. During World War II, Inc received many U.S. Government ("E") awards for excellence in production for outstanding contributions to the war effort.

16. Starting in the 1960s, Inc rebranded from "United States Rubber" to "Uniroyal" to reflect the expansion of its enterprises to include chemicals, plastics, and industrial products and create a unified corporate identity. Like many other old and storied U.S. companies, Inc faced an increasingly difficult business environment in this period—increased foreign competition, challenging economic conditions, labor unrest, and aging plants requiring substantial investments. However, under new management, Inc began to turn the corner and return to profitability. Uniroyal closed or sold unprofitable businesses, slashed costs, developed new products and refocused on core businesses.

17. As a result of that nascent turnaround, Inc entered the 1980s as an attractive acquisition target due to its diversified portfolio of businesses and potential for growth. In early 1985, following a hotly contested hostile takeover attempt by a corporate raider who, it was feared, would destroy the company and renege on obligations to retirees and employees, Inc became privately rather than publicly owned. The private owners consisted of three groups—Inc's management team, Clayton & Dubilier Private Equity Fund Ltd. Partnership, an investment fund, and a collection of various other private investors.

18. Subsequent to the transaction described above, Inc reorganized as a holding company to increase its flexibility in financing and in operations, as well as to facilitate the disposition of its businesses, if that became advisable, and to decrease costs in connection therewith. To effectuate this goal, Inc engaged in a series of transfers of domestic and foreign

assets and liabilities to six newly-created and wholly-owned subsidiaries. These transfers resulted in the reorganization of its corporate structure along operational lines (the "**1985 Restructuring**"). That structure was as follows:

**UNIROYAL STRUCTURE CHART
AS OF AUGUST 2, 1986**




**UNIROYAL STRUCTURE CHART AS
OF THE PETITION DATE**



19. Each of Inc's subsidiaries formed in connection with the 1985 Restructuring received the assets and, subject to its right to make claims against Inc's insurance, assumed the liabilities associated with the relevant predecessor operating division. Each also indemnified Inc for those assumed liabilities. After the reorganization, Uniroyal was the holder of equity interests in the newly formed Uniroyal Tire Company, Inc. ("**Tire**"). Tire received Inc's domestic and foreign tire, tire cord, and synthetic rubber operations. At the time of the reorganization, Tire was Inc's largest and highest-revenue business line. Uniroyal also assumed responsibility for the liabilities of certain then-discontinued business lines and products of Inc, including the former consumer products, footwear, belting, hose, and asbestos textile operations of Inc.

20. In August 1986, Tire formed a joint venture with the B.F. Goodrich Company ("**Goodrich**"). Tire and Goodrich each assigned their tire company assets and liabilities to a new partnership, the Uniroyal-Goodrich Tire Company ("**UGTC**"), which operated the combined businesses under new management. In return for its contribution of the tire business, Tire received net cash proceeds and a 50% interest in the tire partnership. Uniroyal became an indirect, passive investor in UGTC.

21. As set forth in the preceding structure charts, the other subsidiaries formed as part of the 1985 Restructuring were subsequently sold or dissolved, and, in December 1986, Inc and its parent, CDU Holding, Inc were each dissolved in accordance with applicable state law and a liquidating trust was formed to administer the liquidation of assets.

22. In May 1990, Tire sold its partnership interest in UGTC to *Compagnie Générale des Établissements Michelin*. Tire was liquidated and distributed the net proceeds to Uniroyal and, subsequently, allowed its corporate registration to lapse in 2007. The Debtors have not had any interest in an operating business since that sale.

23. In October 1997, the liquidating trust formed to liquidate Inc's assets terminated. In connection with the termination of that trust, Uniroyal agreed to assume certain of the remaining liabilities of the trust in exchange for cash, insurance, and tangible and intangible assets of the trust. In order to mitigate the risk of assuming unforeseen liabilities, Uniroyal formed Great Hill to assume all unknown liabilities of the Inc liquidating trust in exchange for cash consideration. Subsequently, to maximize returns on assets, Great Hill loaned that cash to Uniroyal as evidenced by an interest-bearing intercompany promissory note executed by Uniroyal on July 20, 1998 (the "**Intercompany Note**").

24. In January of 2004, Uniroyal contributed funds to a stand-alone entity, Naugatuck Partners, LLP, a Delaware limited liability partnership ("**Naugatuck**") as a form of private insurance to provide a third layer of defense for its then current and future directors and officers against claims in the event that Uniroyal does not indemnify them and Uniroyal's directors and officers insurance policy does not provide a defense. Uniroyal funded Naugatuck $3.25 million at its formation. Uniroyal benefitted from, and continues to benefit from, this arrangement because it provides and provided inducement to directors and officers to serve and continue to serve Uniroyal and its affiliates free from undue concern that they will not be so protected.

**B. Management of Retiree Benefit Plan Obligations**

25. The first major challenge addressed in the 1990s was the growing costs associated with the Retiree Benefits Program. When Uniroyal assumed the obligations under the Retiree Benefits Program in 1985, those benefits—essentially full coverage for medical, drug, and life insurance benefits—were typical for the period. Uniroyal's retirees fell into two groups—union and salary. These benefits were important to all retirees, especially since their pensions, which had no cost-of-living increases, averaged only $200 per month.

26. There were more than 10,000 beneficiaries receiving benefits under the Retiree Benefits Program when Uniroyal first assumed liability for the Retiree Benefits Program.

27. Beginning in the late 1980s and continuing through the 1990s, the cost of medical and drug benefits skyrocketed. As with asbestos costs, Uniroyal management realized that these increased costs would quickly become unsustainable. However, Uniroyal was not easily able to reduce the level of benefits since they were arguably locked in by a 1970s union contract for wage retirees and by a federal court class action settlement entitled *Tourangeau v. Uniroyal, Inc.* for salary retirees. Annual costs exceeded $15 million dollars per year.

28. Uniroyal management commenced negotiations with both groups of retirees with the goal of reducing the benefits to be more in line with then-market benefit levels. Uniroyal retirees recognized the serious threat to Uniroyal's continued viability that would be posed by the increasing cost of benefits and PI/WD Claims, and they agreed to substantial reductions in benefits and increased financial contributions by them. In return for the retirees' agreement to reduce their level of benefits, Uniroyal established four voluntary employee beneficiary associations (the "**VEBAs**") to fund the benefits. By law, the assets of those VEBAs could only be used for payment of retiree welfare benefits and their assets could never revert to Uniroyal. The VEBAs provided needed assurance to the retirees that, in the event of Uniroyal's demise, they would continue to receive benefits, funded from the assets available under the VEBAs.

29. Over the next several decades, as the overall benefits environment in the United States evolved, Uniroyal continued to make further modifications to retiree benefits and retirees continued to pay more toward the cost of those benefits. This was always done with the agreement of both groups of retirees. For example, when HMO providers became widely available in the 1990s, wage retirees agreed to make an HMO their principal medical program substituting for

more expensive traditional insurance. Similarly, when Part D drug coverage became available under Medicare in 2006, retirees agreed to drop their previous Uniroyal-funded drug coverage under the Retiree Benefits Program, which also resulted in substantial savings. For approximately the last 25 years, retiree contributions and the annual deductibles have continued to increase on a regular schedule. Their per-person deductible has increased from $0 to $2,000 per year. In return for the retirees' agreements over time to modify and reduce their benefits, Uniroyal has from time to time made additional contributions to their VEBAs. The consensual modifications to the Retiree Benefits Programs have resulted in retiree responsibility for a major portion of the cost of their present benefits. This reduction in retiree benefits is comparable to reductions in payments made to PI/WD Claimants over the years, as set forth in greater detail below.

30. As of the Petition Date, the number of retirees has declined to 140. The retirees' average age is now 92. Uniroyal has been managing the Retiree Benefits Program. As Uniroyal's remaining employees are now well past typical retirement age and wish to retire themselves, a new provider must be found to administer and take responsibility for the retirement program that will continue to provide for retiree benefits.

31. Over the years from time to time, Uniroyal has investigated the possibility of having a third party take over its Retiree Benefits Program obligations. With the assistance of its professional advisors including Mercer Health & Benefits LLC ("**Mercer**"), Uniroyal has now identified a party to administer and pay benefits to retirees as described in Section III of the Declaration. As described below, Uniroyal has made arrangements with AAA creditworthy insurers to assume payment of benefits to these beneficiaries. The funding for that assumption will be made from dedicated trust funds (the remaining VEBA assets) and will not diminish Uniroyal's assets available to satisfy PI/WD Claimants and other creditors.

### C. PI/WD Claims

32. The second major challenge addressed in the 1990s was an avalanche of PI/WD Claims that could not have been reasonably anticipated at the time of Uniroyal's formation. In the 1980s when Uniroyal was formed, Inc faced a relatively small number of PI/WD Claims related to its production and sale of asbestos textile products, including fire-resistant asbestos fabric installed on U.S. Navy vessels toward the end of World War II. That business line had been discontinued in early 1976. Inc was one of six original asbestos textile manufacturers, and the smallest measured by product produced and sold. PI/WD liabilities associated with asbestos textiles were expressly assumed by Uniroyal pursuant to that certain *Restated Assumption of Liabilities and Indemnification Agreement* dated October 27, 1985 (the "**Restated Assumption**") as part of the 1985 Restructuring.

33. At the time of Inc's dissolution in 1986, there were approximately 2,800 PI/WD Claims pending against it. Inc had collectively litigated or settled more than 2,400 PI/WD Claims at an aggregate total cost of $6.7 million. At this time, Uniroyal was considered a very minor defendant in the asbestos litigation.

34. In connection with the dissolution of CDU Holding, Inc. and Inc, the boards of directors of each of the foregoing carefully considered whether Uniroyal had sufficient assets to satisfy its outstanding liabilities. Their consideration included (a) detailed analysis and projections of current and future liabilities, including liability exposure to PI/WD Claims; (b) analysis of Uniroyal's available insurance coverage; (c) the commission of a third-party expert's analysis of Uniroyal's going concern value; and (d) consideration of that expert's report finding that Uniroyal was adequately capitalized to handle all known and anticipated liabilities (including PI/WD Claims).

35. Beginning in the mid-1990s, which was nearly a decade after Inc's dissolution, the total number of PI/WD Claims asserted against Uniroyal as well as the cost to settle such claims began to increase dramatically. From a total of approximately 2,800 PI/WD Claims pending against Uniroyal in 1986, general filings of new cases escalated from 18,975 in 1993 to 36,673 in 1995, to 48,197 in 2001 and to a high-water mark of 70,107 new filings in 2002. This increase was largely due to the exit of the historical front-line defendants as they filed for bankruptcy. Eventually, over 100 defendants filed for bankruptcy due to asbestos claims. Those include large companies such as Johns-Manville, Raybestos-Manhattan, Amatrex, GAF, W.R. Grace, and many others. In fact, Uniroyal may be the last, or one of the last, asbestos product manufacturers to file for bankruptcy.

36. For the last 40 years, Uniroyal has successfully settled or defended claims against it and managed its liabilities, but the sheer number of asserted litigation claims is massive and will quickly become unmanageable upon retirement of the current Uniroyal employee team that has actively directed and coordinated this effort. Since Uniroyal's formation more than 40 years ago, 516,656 PI/WD Claims have been filed against it. Uniroyal has resolved and made payments of just under $500 million for 216,994 of those cases. 264,232 of those claims were dismissed without payment, leaving a total of over 35,000 pending cases. Uniroyal has paid an additional amount of $160 million in defense costs.

37. A key example of Uniroyal's active management of its asbestos liability is what it calls the "**GIC Plan**", an innovative arrangement developed in response to the threat posed by the avalanche of new cases in the mid-1990s as other defendants filed for chapter 11. The plan was essentially a credit enhancement device pursuant to which Uniroyal would deposit funds in a trust fund for each asbestos plaintiff law firm. Those funds were intended to be protected in the event

Uniroyal was forced to file bankruptcy. The quid pro quo for establishment of those trust funds was a significant reduction in settlement value and removal of Uniroyal from active asbestos litigation. To fund the trust, Uniroyal originally purchased guaranteed investment contracts from extremely credit-worthy issuers, typically "AAA", and later used assigned receivables from its insurance settlements to fund the trusts.

38. The vast majority of asbestos plaintiffs' law firms agreed to this GIC Plan. I personally met with all of the asbestos plaintiff firms involved and shared details of Uniroyal's financial situation and our goals to continue to provide benefits for retirees, albeit at sharply reduced but affordable levels. As a result, Uniroyal was able to reduce its asbestos settlement costs by over 90% and virtually eliminate all of its legal defense costs for asbestos, which went from a high of $15 million annually to less than $500,000 annually. These defense cost savings benefited PI/WD Claimants by maximizing value available to honor legitimate claims.

**D. Insurance Litigation**

39. The third major challenge addressed in the 1990s was the depletion of available insurance proceeds. Under the Restated Assumption, Uniroyal's assumption of liabilities from Inc was subject to Uniroyal's right to whatever coverage was available under Inc's comprehensive general liability insurance policies. Those included liabilities for PI/WD Claims. As first-layer coverage was running out in the early 1990s, Uniroyal commenced a lawsuit in New Jersey against all of its more than 30 upper-layer insurance companies. That litigation, *Uniroyal, Inc. v. American Reinsurance Co., et al.*, lasted for nearly a dozen years and involved complex issues that included policy triggers, allocation, annual limits, defense cost availability, and deductible application. Following receipt of a series of favorable rulings at the trial court, Uniroyal entered into settlement agreements with most of the defendant insurance carriers pursuant to which Uniroyal eventually

received nearly $400 million in payments. Uniroyal used these payments, together with over $181 million of Uniroyal's other funds, exclusively to fund the settlement and defense of PI/WD Claims through the Petition Date. This amount was in addition to the nearly $100 million received from first-layer excess insurers as a result of litigation commenced in the mid-1980s by Inc.

40. The non-settling insurance carriers appealed the trial court's decisions. The appellate court reversed virtually all of the trial court's rulings in favor of Uniroyal. The effect of the appellate court's rulings, particularly the ruling on per-occurrence deductibles, which the court determined should apply to each and every asbestos claim without a cap or "stop-loss", meant that Uniroyal would have received no insurance proceeds had it not reached the settlements that it did.

**E. Corporate Governance**

41. Since successfully navigating the major challenges of the 1990s, Uniroyal's dedicated staff has continued to provide retirement benefits and satisfy PI/WD Claims in accordance with the applicable agreements and policies, successfully disposed of non-PI/WD tort and environmental claims without any material verdicts, and otherwise maximized the value of Uniroyal's limited assets for the benefit of all stakeholders at the time of their ultimate distribution.

42. The Uniroyal board of directors currently consists of three members: Alfred F. Ingulli, myself and William H. Henrich, who is a restructuring professional who was elected on April 11, 2025 to serve as an independent and disinterested director. The board of directors of Great Hill currently consists of Anthony A. Valentino, Jr., and myself.

43. Uniroyal has five employees as described above. Great Hill has no employees. A list of Uniroyal's and Great Hill's officers is included below.

| Uniroyal Officers | |
|---|---|
| Position | Name |
| President, General Counsel, and Secretary | Robert V. D'Angelo, Jr. |
| Vice President and Manager, Legal Administration, and Assistant Secretary | Joanne Ciriello |
| Vice President and Treasurer | Anthony A. Valentino, Jr. |

| Great Hill Officers | |
|---|---|
| Position | Name |
| President and Treasurer | Anthony A. Valentino, Jr. |
| Vice President and Secretary | Robert V. D'Angelo, Jr. |
| Assistant Secretary | Joanne Ciriello |

### F. Capital Structure

44. The Debtors have no third-party-funded debt.

45. Great Hill is the beneficiary of the Intercompany Note. The Intercompany Note has an interest rate of the one-year Treasury bill plus .75 and a maturity date of July 20, 2003, which was subsequently extended to July 20, 2013, and extended again to July 20, 2028. As of the Petition Date, the unpaid balance on the Intercompany Note, consisting of principal and accrued interest, was $2,483,730.11.

46. In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "**Ordinary Course Claims**") to various entities that provide goods and services to facilitate the Debtors' business operations. As of the Petition Date, the Debtors estimate that the aggregate amount of Ordinary Course Claims outstanding is less than $5,000.

47. Uniroyal is the direct corporate parent of Great Hill. Approximately 32.5% of the fully diluted stock of Uniroyal is held by the Clayton & Dubilier Private Equity Fund Ltd. Partnership. The remainder is disparately held, with no other party holding more than 5.0% of the fully diluted stock. Uniroyal has never issued a dividend or distribution to its shareholders.

## III. Circumstances Leading to the Chapter 11 Cases

48. For the reasons detailed above, the Debtors engaged the Advisors to consider the terms of a final disposition of their assets, resolution of their liabilities, and cessation of their activities.

49. Beginning in August 2025, the Debtors have engaged with several law firms representing a significant number of PI/WD Claims. Those law firms subsequently formed the Ad Hoc Group and retained Brown Rudnick LLP, as legal advisor, and Province LLC, as financial advisor.

50. The Debtors cooperated with the Ad Hoc Group's extensive diligence process, including providing access to the Debtors' management team and professionals and thousands of pages of documentation dating back to and before the 1985 Restructuring. The Debtors and the Ad Hoc Group engaged in good-faith negotiations. After months of discussions, the Debtors and the Ad Hoc Group agreed on the key terms of the Plan and executed the RSA on July 31, 2026.

51. In parallel with this process, the Debtors engaged in an extensive search to identify a third party willing to assume administration of the Debtors' Retiree Benefits Program that were fully funded as described in Section II above. Despite the best efforts of the Debtors and their professionals, the Debtors were unable independently to identify a third party willing to continue to administer the Debtors' Retiree Benefits Program in a cost-effective manner that would provide retirees continuity of medical benefits for life in the current format.

52. Accordingly, the Debtors engaged Mercer to help identify potential modifications that could be made to Uniroyal's Retiree Benefits Program that would provide an avenue for the beneficiaries thereof to receive the promised life insurance benefits and to continue to receive

meaningful financial support to obtain similar medical and drug benefits during their lifetimes and release Uniroyal from its obligations.

53. The Debtors, Mercer, and Debevoise & Plimpton LLP engaged in extensive analysis of Uniroyal's retiree population, market data, available coverage options, and the restrictions and requirements applicable to the VEBAs. Following this analysis, the Debtors, in consultation with their Advisors, determined that the structure most likely to achieve these goals was the purchase of an annuity to fund stipends that beneficiaries could use to purchase insurance coverage through an exchange administered by an exchange services provider. The exchange services provider would also advise beneficiaries regarding the selection of plans based on their health needs, available funding, and current medical providers. The Debtors originally anticipated that replacement life insurance coverage would be incorporated into this overall arrangement.

54. Mercer then conducted a thorough market process to identify interested providers. Mercer obtained six bids in connection with this process: one bid to provide replacement life insurance coverage, one bid to provide an annuity, and four bids to provide exchange services. The terms of the bids required the Debtors to make a preliminary determination by July 31, 2026, as to which bids to pursue in order to ensure sufficient time for implementation. Any modification of the Retiree Benefits Program remains subject to review and approval by the Bankruptcy Court.

55. In parallel with this process, in order to obtain feedback from the beneficiaries of the Retiree Benefits Program, the Debtors considered various options for counsel for retirees and ultimately facilitated introductions between beneficiaries of the Retiree Benefits Program and Porzio, Bromberg & Newman, P.C. ("**Porzio**"). Certain beneficiaries of the Retiree Benefits Program have formed an ad hoc group of beneficiaries (the "**Retiree Ad Hoc Group**") and engaged Porzio to represent them.

56. The Debtors have consulted with Porzio regarding the terms of the bids, including by providing Porzio with access to supporting documents and the opportunity to discuss the bids with Mercer and the Debtors' management team. Following those discussions, the Debtors, in consultation with Porzio, selected three bids to pursue: the bid to provide replacement life insurance coverage, the bid to provide an annuity, and one bid to provide exchange services from a provider offering integration with the provider bidding on the annuity. The Debtors believe that, taken together, the arrangements contemplated by the selected bids will provide most if not all beneficiaries of the Retiree Benefits Program with the same or better benefits than they currently receive under the Retiree Benefits Program.

57. The Debtors continue to coordinate with the selected providers and engage with Porzio and the Retiree Ad Hoc Group regarding the terms of the proposed modification. In order to ensure that the interests of beneficiaries are fully considered in these chapter 11 cases, the Debtors will request that the Bankruptcy Court order the appointment of an official committee of retirees.

## IV. Motions

58. To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing operations and to promote a smooth transition into chapter 11, the Debtors have requested various relief in the Motions. The Motions seek authority to, among other things, maintain employee morale, ensure the continuation of the Debtors' cash management systems and other operations without interruption, and tailor chapter 11 relief to the facts and circumstances of these cases including by filing a list of the law firms representing the largest numbers of holders of PI/WD Claims against the Debtors (the "**PI/WD Counsel List**") in lieu of a list of the holders of the twenty largest unsecured claims against the Debtors. Receiving

Court approval of the relief sought in the Motions is essential to giving the Debtors an opportunity to work towards an expeditious confirmation of the Plan and, therefore, maximize the value of their estates.

59. Several of the Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. I understand that other relief will be deferred for consideration at a later hearing.

60. Additionally, I understand that the Court's General Order Governing Protocol for the Retention of Claims and Noticing Agents Under 28 U.S.C. § 156(c) Pending Adoption of Local Rule sets certain requirements for the process of choosing claims and noticing agents. Omni Agent Solutions, Inc. was selected as the Debtors' proposed claims and noticing agent only after the Debtors' review and competitive comparison of proposals from three qualified providers.

61. I have reviewed each of the Motions. The facts stated therein are true and correct to the best of my information and belief, and I believe that the relief sought in each of Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their operations and constitutes a critical element in successfully consummating the Plan and maximization of value of all parties in interest.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 31st day of July, 2026.

By: Robert V. D'Angelo Jr.
Name: Robert V. D'Angelo, Jr.
Title: President, General Counsel, Uniroyal Holding, Inc.
Vice President and Secretary, Great Hill Corporation