UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: jeffrey.m.sponder@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| Uniroyal Holdings Inc., et al.,[1] | Case No. 26-18668 (MBK) |
| Debtors. | The Honorable Michael B. Kaplan |
| | Hearing Date: November 3, 2026 at 10:00 a.m. |

**OBJECTION OF THE UNITED STATES TRUSTEE TO JOINT PLAN OF UNIROYAL HOLDING, INC. AND GREAT HILL CORPORATION**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, objects to confirmation of the *Joint Chapter 11 Plan of Uniroyal Holding, Inc. and Great Hill Corporation* [D.I. 194-1] (the "Plan"),[2] and respectfully states as follows:

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal taxpayer identification number, are: Uniroyal Holding, Inc. (8485) and Great Hill Corporation (9024). The mailing address for each Debtor for purposes of these chapter 11 cases is 70 Great Hill Roda, Naugatuck, CT 06770.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (including exhibits), as applicable.

## PRELIMINARY STATEMENT

1. The U.S. Trustee objects to confirmation of the Plan because it would deem certain creditors to consent to third-party releases based on inaction, namely, their failure to opt out. In addition, to the extent that exculpation is permissible beyond the provisions of Bankruptcy Code section 1125(e), the proposed Plan's exculpation provision violates controlling Third Circuit case law.

2. In addition, the U.S. Trustee objects to confirmation of the Plan because the Plan contains (i) overbroad Debtor releases and injunctions, (ii) an improper gatekeeping role for the Court, (iii) an improper waiver of the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e); (iv) language that impermissibly deems non-voting classes to accept the Plan, and (v) language that needs to be revised concerning U.S. Trustee Fees.

3. Further, the U.S. Trustee objects to confirmation of the Plan as it appears that the Plan binds future asbestos claimants without any representation. As the Debtors chose not to pursue these cases under section 524(g), it does not appear that future claimants were involved in the pre-petition negotiations leading to the amount to be included in the Trust, and did not take part in the postpetition negotiations concerning the terms of the Trust and the TDP. Also, the TDP should contain a retention policy in order to deter future litigation should the Trustee seek to destroy documents.

4. Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation of the Plan.

## JURISDICTION AND STANDING

5. This Court has jurisdiction to hear and determine confirmation of the Plan and this objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable orders of the United States District

Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

6. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

7. The U.S. Trustee has standing to be heard concerning confirmation of the Plan and this objection pursuant to 11 U.S.C. § 307. *See U.S. Tr. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

## BACKGROUND

### A. The Chapter 11 Cases

8. On July 31, 2026, Uniroyal Holding, Inc. ("Uniroyal") and its affiliated debtor Great Hill Corporation ("Great Hill", altogether the "Debtors") commenced these chapter 11 cases by filing voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code"). For example, *see* Case No. 26-18668/MBK at D.I. 1.

9. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

10. On August 20, 2026, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "Committee"). *See* D.I. 95.

11. On August 27, 2026, the U.S. Trustee appointed an Official Committee of Retirees (the "Retiree Committee"). *See* D.I. 105.

12. As of the date hereof, no trustee or examiner has been requested or appointed.

**B. The Debtors and their Businesses**

13. As set forth in the Disclosure Statement, "Uniroyal's principal objectives for the last 41 years have been to provide post-employment welfare benefits . . . to certain retirees of discontinued businesses of [Uniroyal Holding] Inc and retirees of Uniroyal . . . and to manage various types of litigation." *See* D.I. 20 at page 21 of 220. Concerning Great Hill, "Uniroyal's principal objectives for the last 41 years have been to provide post-employment welfare benefits, the most significant of which are medical and life insurance benefits, to certain retirees of discontinued businesses of Inc and retirees of Uniroyal . . . and to manage various types of litigation." *See id.* at page 24 of 220.

14. The Debtors filed bankruptcy in order to implement their wind-down strategy centered around continuing to manage Retiree benefits and manage tort litigation. *See id.* at page 13 of 220.

**C. The Plans, Disclosure Statements, and Motion for Approval of the Disclosure Statement**

15. On July 31, 2026, the Debtors filed a *Joint Chapter 11 Plan of Uniroyal Holding, Inc. and Great Hill Corporation*, and the related Disclosure Statement. *See* D.I. 18, 20.

16. Also on July 31, 2026, the Debtors' filed a *Motion for Entry of an Order (i) Approving the Disclosure Statement, (ii) Approving Solicitation, Notice and Tabulation Procedures and Forms Related Thereto, (iii) Scheduling a Confirmation Hearing, (iv)*

*Establishing Notice and Objection Procedures for Plan Confirmation; and (v) Granting Related Relief*. *See* D.I. 21.

17. On September 22, 2026, the Debtors filed the Plan and a *Revised Disclosure Statement for the Joint Chapter 11 Plan of Uniroyal Holding, Inc. and Great Hill Corporation*. *See* D.I. 194 and 195.

18. On September 23, 2026, the Court entered an Order *(i) Approving the Disclosure Statement, (ii) Approving Solicitation, Notice and Tabulation Procedures and Forms Related Thereto, (iii) Scheduling a Confirmation Hearing, (iv) Establishing Notice and Objection Procedures for Plan Confirmation; and (v) Granting Related Relief*. *See* D.I. 205.

19. On October 20, 2026, the Debtors filed the Plan Supplement. *See* D.I. 229.

**D. Specific Provisions of the Plan**

20. The Plan includes the following provisions relevant to this Objection.

**i. Third Party Release Provision**

21. Section 9.2 of the Plan broadly provides that the Releasing Parties[3] shall release and discharge each of the Released Parties[4] "from any and all claims, obligations, rights, suits,

[3] The Plan defines "Releasing Parties" as follows:

> "Releasing Parties" means, collectively, and in each case solely in their respective capacities as such: (1) each Released Party; (2) each holder of a Claim in Class 1, Class 2, or Class 3 that has not filed an objection to the release contained in section 9.2 herein prior to the deadline to submit a ballot to accept or reject the Plan or timely submitted a Release Opt-Out; (3) each holder of a Claim in Class 4 that did not check the Release Opt-Out on its ballot; and (4) each Related Party of an Entity in clauses (2) through (3) solely to the extent that such Entity is legally entitled to bind such Related Party to the releases contained in section 9.2 herein.

*See* D.I. 194-1 at Section 1.1.78, page 16 of 55.

[4] The Plan defines "Released Party" as follows:

> "Released Party" means, in each case solely in its capacity as such: each of (1) the Debtors, (2) the Debtor Related Parties, (3) each Holder of an Interest, (4) the Ad Hoc Group, (5) the Committee, and (6) each Related Party of each party described in clauses (3) through (4). Notwithstanding anything to the contrary herein, the term "Released Party" shall not include (a) any successors in interest to (i) Uniroyal Power Transmission, Inc. (including The Gates Rubber Company, Tomkins

damages, causes of action, remedies, and liabilities whatsoever (in each case whether prepetition or postpetition up until the Effective Date)."[5] *See* D.I. 194-1 at Section 9.2, page 38-39 of 55.

---

> plc, Onex Corporation, Blackstone, and Gates Industrial Corporation plc), (ii) Uniroyal Plastics Company, Inc. (including Polycast Technology Company and Uniroyal Technology Corp.), (iii) Uniroyal Chemical Company, Inc. (including Uniroyal Chemical Acquisition Corporation, Avery, Inc., Chemtura Corporation, and Laxness AG), (iv) Michelin North America, Inc., (v) Uniroyal Textiles (including Dominion Textile, Polymer Group, Inc., Blackstone, Avintiv, Inc., Berry Global Group, Inc., and Amcor PLC), (vi) Uniroyal-Goodrich Tire Company, or (vii) Uniroyal Properties Company, Inc., or for the foregoing (a)(i)-(vii) any of their affiliates, or (b) Michelin and any of its past, present and future Affiliates, parent and subsidiary entities, related parties, successors, board members, executives, and shareholders solely in their capacity as such; provided, however, that the exclusions set forth in clauses (a) through (b) shall apply only to the extent such party is not listed on Schedule 2 of the Plan.

*See* D.I. 194-1 at Section 1.1.77, page 15 of 55.

[5] The Plan's release provision states as follows:

> As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever (in each case, whether prepetition or postpetition up until the Effective Date), including: (1) any derivative claims asserted or that may be asserted on behalf of the Debtors or their estates, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the conduct of their business (in each case, whether prepetition or postpetition up until the Effective Date); (2) the formulation, preparation, dissemination, or negotiation of: (a) the Plan; (b) the Disclosure Statement; or (c) any contract, instrument, release, or other agreement or document created or entered into in connection with: (i) the Plan; (ii) the Disclosure Statement; or (iii) these chapter 11 cases; (3) the pursuit of confirmation of the Plan; (4) the pursuit of consummation of the Plan; (5) the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement; and (6) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (in each case, whether prepetition or postpetition) related or relating to the foregoing.
>
> Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 9.2 shall not release (1) any Released Party from claims or causes of action arising from an act or omission that is judicially determined by a final order to have constituted actual fraud, willful misconduct, or gross negligence; or (2) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement executed to implement the Plan.
>
> Each Releasing Party deemed to grant the releases described in this Section 9.2 shall be deemed to have granted such releases notwithstanding that such person or entity may hereafter discover facts in addition to, or different from, those which such person or entity now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such person or entity expressly waives any and all rights that such person or entity may have under any statute or common law principle, including, without limitation, Section 1542 of the California Civil Code, to the extent such section is applicable, which would limit the effect of such

22. The Released Parties include each Debtor Related Party[6] and each Related Party[7] of each Person or Entity listed in clauses (3) and (4) of the definition of "Released Party". *See* D.I. 194-1 at Section 1.1.77, page 15 of 55.

23. Holders of Claims in Classes 1, 2, 3, 5, and 6 are either unimpaired or are insiders or Affiliates of the Debtors or impaired but deemed to reject; as a result, they are either presumed to have accepted the Plan or deemed to have rejected it, and so are not entitled to vote on the Plan. *See* D.I. 194 at Section 3. Instead, pursuant to the Solicitation and Voting Procedures, the

---

> releases to those claims or causes of action actually known or suspected to exist on the Effective Date.
>
> Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with a debtor or released party.

*See* D.I. 194-1 at Section 9.2, page 38-39 of 55.

[6] The Plan defines "Debtor Related Parties" as follows:

> "Debtor Related Parties" means, collectively, with respect to a Debtor, its Affiliates, and other legal representatives and its and their (1) present and former, in each case, shareholders, direct and indirect owners, partners, members, participants, managers, consultants, subsidiaries, divisions, management companies, managed accounts or funds, fund advisors, predecessors, directors, officers, attorneys, accountants, financial advisors, investment bankers, employees, agents, and other representatives, (2) present Affiliates, and (3) former Affiliates solely to the extent such affiliation terminated on or after January 1, 1991.

*See* D.I. 194-1 at Section 1.1.26, page 10 of 55.

[7] The Plan defines "Related Party" as follows:

> "Related Party" means with respect to any Entity, each of its Affiliates, and other legal representatives and its and their present and former, in each case, shareholders, direct and indirect owners, partners, members, participants, managers, consultants, Affiliates, subsidiaries, divisions, management companies, managed accounts or funds, fund advisors, predecessors, directors, officers, attorneys, accountants, financial advisors, investment bankers, employees, agents, and other representatives.

*See* D.I. 194-1 at Section 1.1.75, page 15 of 55.

holders of claims in Classes 1, 2, 3, 5, and 6 received a Notice of Non-Voting Status and Opt-Out Form. *See* D.I. 205 at Exhibit 5, page 77 of 87.

24. The Notice of Non-Voting Status and Opt-Out Form specifies that a recipient who fails to timely and properly submit an Opt-Out Form to the Balloting Agent by the Opt-Out Deadline with the opt-out box checked will be deemed to have consented to the third-party releases in Section 9.2 of the Plan. *See id.* at page 78 of 87. The Notice of Non-Voting Status further provides that in the event you opt-out of the third-party releases in the Plan, you will not be granted a release from the Releasing Parties under the Plan to the extent you are entitled to one." *See id.* at pages 78-79 of 87.

25. Holders of Claims in Class 4 are impaired and entitled to vote under the Plan. *See* D.I. 194 at Section 3, pages 20-22 of 55. The ballots provided to the voting classes included an opt-out election. *See* D.I. 205 at Exhibits 3 and 4, pages 49-76 of 87. The opt-out election provides that a claimant will be deemed to provide the releases contained in Section 9.2 of the Plan unless the box is checked and the ballot submitted to the Balloting Agent prior to the Voting Deadline. *See id.*

**ii. Debtor Release Provision**

26. Section 9.1 of the Plan broadly provides that the Debtors, the Estates, and any and all other Entities who may purport to assert any Cause of Action by, through, for, or because of the foregoing entities are deemed to release and discharge each Released Party.[8] *See* D.I. 194-1 at

---

[8] The Plan provides for Debtor Releases as follows:

> Pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors, their estates, and any and all other entities who may purport to assert any cause of action by, through, for, or because of the foregoing entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each released party from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever (in each case, whether prepetition or postpetition) including: (1) any derivative claims asserted or that

Section 9.1, pages 36-37 of 55. The Claims being released include "any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever (in each case, whether prepetition or postpetition). *See id.*

**iii. Exculpation Provision**

may be asserted on behalf of the debtors or their estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the debtors or the conduct of their business (in each case, whether prepetition or postpetition); (2) the formulation, preparation, dissemination, or negotiation of: (a) the plan; (b) the disclosure statement; or (c) any contract, instrument, release, or other agreement or document created or entered into in connection with: (i) the plan; (ii)the disclosure statement; or (iii) these chapter 11 cases; (3) the pursuit of confirmation of the plan; (4) the pursuit of consummation of the plan; (5) the administration and implementation of the plan, including the distribution of property under the plan or any other related agreement; and (6) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the effective date (in each case, whether prepetition or postpetition) related or relating to the foregoing. notwithstanding anything to the contrary in the foregoing, the releases set forth in this section 9.1 shall not release (1) any released party from claims or causes of action arising from an act or omission that is judicially determined by a final order to have constituted actual fraud, willful misconduct, or gross negligence or (2) any post-effective date obligations of any party or entity under the plan or any document, instrument, or agreement executed to implement the plan. entry of the confirmation order shall constitute the bankruptcy court's approval of the releases described in this section 9.1 by the debtors, their estates, and any and all other entities who may purport to assert any cause of action by, through, for, or because of the foregoing entities, which includes by reference each of the related provisions and definitions contained in this plan, and further, shall constitute the bankruptcy court's finding that each release described in this section 9.1 is: (1) in exchange for the good and valuable consideration provided by the released parties, including, without limitation, the released parties' contributions to implementing the plan; (2) a good-faith settlement and compromise of the claims released by the debtors; (3) in the best interests of the debtors and all holders of claims and interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the debtors' business judgment; and (7) a bar to the debtors or their estates, asserting any claim or cause of action related thereto, of any kind, against any of the released parties or their property.

*See* D.I. 194-1 at Section 9.1, pages 36-37 of 55.

27. Section 9.3 of the Plan contains an exculpation provision[9] for Exculpated Parties.[10] *See* D.I. 194-1 at Section 9.3, pages 38-39 of 55.

**iv. Injunction Provisions**

28. Section 9.4 of the Plan contains an injunction[11] and broadly provides that "all Holders of Claims and Interests and other parties in interest, along with their respective present or

[9] The Plan's exculpation provision states as follows:

> As of the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest, for (1) any act or omission in connection with, relating to, or arising out of, these chapter 11 cases from the petition date to the effective date; (2) the formulation, preparation, dissemination, negotiation, filing, or consummation of the disclosure statement or the plan; (3) the filing of these chapter 11 cases; (4) the pursuit of confirmation of the plan; (5) the administration and implementation of the plan, including providing any legal opinion requested by any person or entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the plan or the reliance by any exculpated party on the plan, the confirmation order, the issuance or distribution of securities pursuant to the plan or the distribution of property under the plan or any other agreement (whether or not such issuance or distribution occurs following the effective date); (6) negotiations regarding or concerning any of the foregoing; and (7) the administration of the plan or property to be distributed hereunder. the exculpated parties shall be deemed to have participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code. Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the plan.

*See* D.I. 194-1 at Section 9.3, pages 38-39 of 55.

[10] The Plan defines "Exculpated Parties" as follows:

> "Exculpated Party" means (1) each Debtor; (2) any Entity (other than an ordinary course professional) retained in the Debtors' chapter 11 cases pursuant to a final order in accordance with sections 327, 328, 330, 331, 363, or 1103 of the Bankruptcy Code; and (3) each of the Debtors' current officers and directors in their capacity as such, in each case solely in their respective capacities as such and solely to the extent they served in such capacity between the Petition Date and the Effective Date.

*See* D.I. 194-1 at Section 1.1.37, page 11 of 55.

[11] The Plan's injunction provision states as follows:

> Except as otherwise provided in the Plan or the Confirmation Order, all entities who have held, hold, or may hold claims, interests, causes of action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) are subject to exculpation pursuant to the Plan; or (4) are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any claims, interests, causes of action, or liabilities that have been compromised or settled against the Debtors or any entity so released or exculpated (or the property

former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtors, the Plan Administrator, the Trust, and their respective affiliates, employees, advisors, officers and directors, or agents" *See* D.I. 194-1 at Section 9.4, pages 42-33 of 55. In addition, all entities who have held, hold, or may hold claims, interests, causes of action, or liabilities that are subject to compromise and settlement pursuant to the Plan, have been released pursuant to the Plan, are subject to the exculpation pursuant to the Plan, or are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing any action proceeding against the Debtors to any entity so releases or exculpated. *See id.*

---

> or estate of any entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to any released, settled, compromised, or exculpated claims, interests, causes of action, or liabilities, including being permanently enjoined and precluded from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Plan Administrator, the Trust, the Released Parties, or Exculpated Parties (as applicable): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estate of such entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff or subrogation of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such claims or interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding any other indication of a claim or interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.
>
> Upon the Bankruptcy Court's entry of the Confirmation Order, all holders of claims and interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtors, the Plan Administrator, the Trust, and their respective affiliates, employees, advisors, officers and directors, or agents.

*See* D.I. 194-1 at Section 9.4, pages 41-42 of 55.

29. Section 9.5 of the Plan includes an Insurance Entity Injunction[12] that stays, restrains, and enjoins all persons from taking any action against an insurance company arising out

[12] The Plan's insurance injunction in Section 9.5 of the Plan states as follows:

> All persons that have held or asserted, that hold or assert, or that may in the future hold or assert any cause of action against any insurance company based upon, attributable to, arising out of, or in any way connected with any insurance policy, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, statute or any other theory of law, equity or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such cause of action, including:
>
> (1) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such cause of action, demand, or cause of action against any insurance company, or against the property of any insurance company, with respect to any such cause of action, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action or other proceeding with respect to any such cause of action, demand, or cause of action against any insurance company);
>
> (2) enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment award, decree, or other order against any insurance company, or against the property of any insurance company, with respect to any such cause of action;
>
> (3) creating, perfecting or enforcing in any manner, directly or indirectly, any lien or encumbrance against any insurance company, or the property of any insurance company, with respect to any such cause of action; and
>
> (4) except as otherwise specifically provided in this Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, or contribution of any kind, directly or indirectly, against any obligation of any insurance company, or against the property of any insurance company, with respect to any such cause of action;
>
> Provided, however, that (a) this injunction shall not impair in any way any actions brought by the Trust against any insurance company, (b) the Trust shall have the authority at any time to terminate, or reduce or limit the scope of, the injunction with respect to any insurance company, in accordance with the Trust Documents, upon express written notice to such insurance company, and (c) this injunction is not issued for the benefit of any insurance company, and no insurance company is a third-party beneficiary of this injunction.
>
> Notwithstanding anything to the contrary in this Plan, this injunction shall not enjoin:
>
> (1) the rights of any insured party under any coverage of any D&O policy;
>
> (2) the rights of any successor in interest to (1) Uniroyal Properties, Inc., (2) Uniroyal Tire Company, Inc., (3) Uniroyal Plastics Company, Inc., (4) Uniroyal Power Transmission, Inc., or (5) Uniroyal Chemical Company, Inc. under any coverage of any insurance policy that was the subject of litigation in Uniroyal, Inc. v. American Reinsurance Co., et al.;
>
> (3) the rights of any person to the treatment accorded them under this Plan, as applicable, including the rights of holders of PI/WD claims to assert such claims, as applicable, in accordance with the Trust Distribution Procedures;

of or in connection with an Insurance Policy for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such cause of action. *See* D.I. 194-1 at Section 9.5, pages 41-42 of 55.

**iv. Gatekeeping Provision**

30. Section 9.4 of the Plan also includes a gatekeeping provision[13] that forces claimants who wish to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action is colorable and can proceed. *See id.*

---

(4) the rights of the Trust to prosecute any action based on or arising from insurance policies;

(5) the rights of the Trust to assert any cause of action, debt, obligation, or liability for payment against any insurance company based on or arising from the insurance policies;

(6) the rights of any insurance company to assert any cause of action, debt, obligation, or liability for payment against any other insurance company; or

(7) the cause of action for reinsurance under reinsurance contracts or cause of action under retrocessional contracts among an insurance company and any another insurance company.

*See* D.I. 194-1 at Section 9.5, pages 41-42 of 55.

[13] The Plan's gatekeeping provision states as follows:

> No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party or entity commencing, continuing, amending, or pursuing, a cause of action of any kind against the Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a cause of action subject to Section 9.1, Section 9.2, or Section 9.3 herein without first (1) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such cause of action represents a colorable claim against such Debtor, Exculpated Party, or Released Party and is not a claim that the Debtors released under this Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (2) obtaining from the Bankruptcy Court specific authorization for such party to bring such cause of action against any such Debtor, Exculpated Party, or Released Party. To the extent that any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any causes of action not explicitly included in the authorized complaint or petition, such party must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a cause of action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable cause of action.

*See* D.I. 194 at Section 9.4, page 41 of 55.

**v. Rule 3020(e) Waiver**

31. The Debtors seek an immediate waiver of the 14-day stay under Fed R. Bankr. P. 3020(e) upon occurrence of the Effective Date.[14] *See* D.I. 194-1 at Section 12.2, page 47 of 55.

**vi. Statutory Quarterly Fees**

32. Section 2.3 of the Plan contains language concerning the payment of U.S. Trustee Fees pursuant to 11 U.S.C. § 1930(a)(6).[15] *See* D.I. 194-1 at Section 2.3, page 19 of 55.

**vii. Deemed Acceptance Provision**

33. According to the Plan, "[i]f a Class contains Claims eligible to vote, and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of Claims in such Class shall be deemed to have accepted the Plan." *See* D.I. 194-1, Section 3.8 at page 22 of 55.

---

[14] The Plan provides for the waiver of the 14-day stay as follows:

> Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Administrator, the Trust, the Holders of Claims and Interests, the Released Parties, the Exculpated Parties, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and all parties in interest.

*See* D.I. 194-1 at Section 12.2, page 47 of 55.

[15] Section 2.3 of the Plan states as follows:

> On the Effective Date, the Debtors shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date. Nothing in the Plan shall release the Debtors or the Plan Administrator from their obligation to pay all U.S. Trustee Fees arising from and after the Effective Date before a Final Order is entered by the Bankruptcy Court closing, dismissing or converting the Chapter 11 Cases. The U.S. Trustee shall not be treated as providing any release under the Plan regarding the U.S. Trustee Fees. The U.S. Trustee shall not be required to file any Proof of Claim or any request for administrative expense for U.S. Trustee Fees. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due. After the Effective Date, the Plan Administrator will file with the Bankruptcy Court all quarterly post-confirmation reports when they become due.

*See* D.I. 194-1 at Section 2.3, page 19 of 55.

**viii. Dissolution of the Tort Committee**

34. Section 12.11 of the Plan provides the Committee and its professionals a separate release and discharge of all rights and duties from, or related to, these cases.[16] *See* D.I. 194-1 at Section 12.11, page 49 of 55. There is no information provided in the Plan concerning the Retiree Committee.

## OBJECTION

**I. Confirmation Standard**

35. A chapter 11 plan cannot be confirmed unless this Court finds the Plan complies with the provisions of section 1129(a) of title 11 of the United States Code (the "Bankruptcy Code"). *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000). A plan proponent bears the burden of proof with respect to each element of section 1129(a). *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

36. For the following reasons, the Plan cannot be confirmed in its present form.

[16] Section 12.11 of the Plan states as follows:

> On the Effective Date, the Committee will dissolve. Upon the dissolution of the Committee, the Committee and its respective Professionals shall cease to have any duty, obligation, or role arising from, or related to, these Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, these Chapter 11 Cases. Notwithstanding the foregoing, the Committee may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Effective Date for the purposes of participating in any (1) appeal of any order entered in these Chapter 11 Cases, including the Confirmation Order, (2) applications for compensation or expense reimbursements of Professionals and any hearing thereon, or (3) adversary proceeding pending on the Effective Date to which the Committee was a participant. To the extent that the Committee determines to continue to serve and function after the Effective Date pursuant to the preceding sentence, it will dissolve upon the completion of its participation in the matters described in clause (1) through (3), as applicable. Effective as of the dissolution of the Committee, the Trust will succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Committee and shall enjoy the work product protections that were applicable or available to the Committee before its dissolution.

*See* D.I. 194-1 at Section 12.11, page 49 of 55.

## II. The Plan is Not Confirmable Because It Proposes Nonconsensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code

### A. Introduction

37. The Court should deny confirmation because the Plan contains nonconsensual third-party releases.

38. Section 1.1.78 of the Plan defines "Releasing Parties" to include: "(2) each holder of a Claim in Class 1, Class 2, or Class 3 that has not filed an objection to the release contained in section 9.2 herein prior to the deadline to submit a ballot to accept or reject the Plan or timely submitted a Release Opt-Out; (3) each holder of a Claim in Class 4 that did not check the Release Opt-Out on its ballot; and (4) each Related Party of an Entity in clauses (2) through (3) solely to the extent that such Entity is legally entitled to bind such Related Party to the releases contained in section 9.2 herein." *See* D.I. 194-1 at Section 1.1.78, page 16 of 55.

39. For the reasons discussed below, a creditor's failure to check an opt-out box on a Ballot or Non-Voting Notice does not constitute consent to a non-debtor release in a chapter 11 plan. Although opt-out provisions have been approved in cases in the District of New Jersey, a careful analysis of applicable law warrants reconsideration of the conclusion that imposing non-debtor releases based on a failure to opt out is permissible. As explained below, state contract law should govern whether non-debtors have agreed to a release. There is no federal law that preempts the requirements of state contract law for such releases.

40. The United States Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226.

41. A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual"). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code. If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

42. Here, there is no existing release agreement between non-debtors. Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under non-bankruptcy law.

43. State law governs whether non-debtors have agreed to release each other. *See infra* Part B. Nothing in the Bankruptcy Code allows parties to disregard state law when debtors seek to impose third-party releases in their plans. Under New York and New Jerey law (*see* Dkt. 194-1, Section 12.10), as in other states, silence is not acceptance of an offer other than in limited circumstances inapplicable here. The Debtors thus cannot deem those who fail to opt out to have released their claims because those claimants have not agreed to the third-party release under state law.

**B. State Contract Law Applies**

44. "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451

(2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered into a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

45. The rule is no different for third-party releases. They are separate agreements between non-debtors governed by state law. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original). *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

46. Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See*, *e.g.*, *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must

govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Bankruptcy Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Bankruptcy Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

47. Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual. But because there is no applicable Bankruptcy Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Bankruptcy Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed,

nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

48. Accordingly, state-law contract principles govern whether a third-party release is consensual. *See*, *e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting

*Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *Id.*

49. Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)); *In re GOL Linhas Aereas Inteligentes S.A.*, 675 B.R. 129, 130 (Bankr. S.D.N.Y. 2025) ("[I]t is not necessary to decide whether federal or state law controls. . . . Here, the same general principles of contract law apply under both federal and state law, so there is no conflict. Those principles indicate that the third-party releases at issue here are nonconsensual and, thus, barred by the Supreme Court in Purdue.") (appeal pending sub nom. *In re GOL Linhas Aereas Inteligentes S.A.*, 26-49 (2d Cir.)). *See* also *In re The Diocese of Buffalo, N.Y.*, 677 B.R. 663, 666 (Bankr. W.D.N.Y. 2026) *citing In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024)(As a voluntary contract among affected parties, a third-party release "would be governed instead by state law.")

**C. Under State Law, Silence Is Not Acceptance**

50. The Debtors bear the burden to prove that the Plan is confirmable. *In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). The Debtors have not met that burden because they have failed to establish that the third-party release is consensual under applicable state law.

51. Under New Jersey law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[17] *See*, *e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned up).

52. Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[18] RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract

[17] Plan Section 12.10 appears to have a New York choice-of-law provision. This provision does not control relations between non-debtors. But regardless of whether New York or New Jersey law applies, the result would be the same. *See In re GOL Linhas Aereas Inteligentes S.A.*, 675 B.R. at 131 ("the New York Court of Appeals has 'repeatedly' held that 'a binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement.'")(citing *Wu v. Uber Tech.*, 260 N.E.3d 1060, 1070 (2024)); *Weichert Co. Realtors*, 608 A.2d 280, 284 (N.J. 1992) ("[i]t is requisite that there be an unqualified acceptance to conclude the manifestation of assent."); *James v. Global Tel*Link Corp.*, 852 F.3d 262, 266 (3d. Cir. 2017) (discussing New Jersey law). *See also In re The Diocese of Buffalo, N.Y.*, 677 B.R. at 666 *citing More v. New York Bowery Fire Ins. Co.*, 130 N.Y. 537, 545 (1892) ("the state's highest court stated the applicable standard: 'The proper inference from failure to respond to a proposition of any kind is that it is rejected or declined. A party cannot be held to contract where there is no assent. Silence operates as an assent, and creates an estoppel, only when it has the effect to mislead'.")

[18] New Jersey, like many states, follows the Restatement (Second) of Contracts § 69. *See, e.g.*, *Weichert Co. Realtors*, 608 A.2d at 284; *James v. Global Tel*Link Corp.*, 852 F.3d at 266. New York also follows the Restatement (Second) of Contracts § 69. *See Wu v. Uber Tech.*, 260 N.E.3d 1060, 1070 (N.Y. 2024).

law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *In re GOL Linhas*, 675 B.R. at 131 ("the general principles of contract law, as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence."); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.). *See also In re The Diocese of Buffalo, N.Y.*, 677 B.R. at 667 (stating agreement with bankruptcy court's analysis in *In re GOL Linhas*, 675 B.R. at 131).

53. There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also*, *e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

54. But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### D. Failing to Opt Out Does Not Provide the Required Affirmative Consent

55. The Plan imposes a third-party release on anyone who is provided a ballot and does not return it with the opt-out box checked and anyone who is provided the Non-Voting Status Notice, which contains a Release Opt-Out Form, and does not return the Release Opt-Out Form. In other words, the Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law, silence is not acceptance of the offer to release non-debtors. *See, e.g.*, *GOL Linhas,* 675 B.R. at 131 (under federal law, consent cannot be conferred by silence absent rare exceptions not applicable to third-party releases in a plan); *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent."). *See also In re The Diocese of Buffalo, N.Y.*, 677 B.R. at 663 ("The longstanding rule in New York is that silence does not constitute consent, except in instances where estoppel might apply.")

56. A case from the Ninth Circuit illustrates the point. In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement. A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement. *See Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage. *See id.* The customer did not opt out. *See id.* When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *See id.* at 1282-83.

57. The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate. The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." *See Norcia*, 845 F.3d at 1284 (quotation marks omitted). *See also, Weichert Co. Realtors v. Ryan*, 128 N.J. at 436 ([s]ilence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *See Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *See id*. at 1286 (quotation marks and citation omitted).

58. The Ninth Circuit held that none of the exceptions to this rule applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

59. Here, too, Debtors' creditors have not signed an agreement to release the non-debtors nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

**i. Not voting and not opting out is not consent to release non-debtors**

60. Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies to both those creditors who simply abstain from voting and those creditors who are not entitled to vote on the Plan because they are deemed to accept or reject. There is no basis to infer consent by those who do not vote and are taking no action with respect to the Plan.

61. Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *See SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re The Diocese of Buffalo, N.Y.*, 677 B.R. at 667-68 ("But the Bankruptcy Code imposes no duty on creditors to vote on a plan or even to read a disclosure statement."); (*GOL Linhas*, 675 B.R. at 132 ("[I]t is undisputed that the creditors had no duty to respond to the opt-out opportunity and courts do not enter default judgment when parties have no duty to respond."); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

62. Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D.

Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *See SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt-out that they must return to avoid being bound by the third-party release.

63. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *See Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *See Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *See Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *See id.*

64. Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *See In re Washington Mut., Inc.*, 442 at 355; *see also Chassix*, 533 B.R. at 81–82.

### ii. Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release

65. Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan. *See* 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors.

66. Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" *See* 533 B.R. at 79 (emphasis added).

### iii. Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect

67. One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote. *See Smallhold*, 665 B.R. at 723. The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release. *See id.* But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "manifestation of intention that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," *id.*—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[19] Thus, consent to release third-party claims (which are governed by nonbankruptcy law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the debtor (governed by bankruptcy law). *See supra*.

### E. Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

68. Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their

[19] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *See In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan. Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *See id.* at *21. " When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[20] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

69. A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022). The *Mallinckrodt* court stated that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *See id*. "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *See id*. at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *See id*.

70. This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather,

---

[20] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 666 B.R. at 715, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond.

"failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *See id.* at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

71. Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731; *In re The Diocese of Buffalo, N.Y.*, 677 B.R. at 668 ("In deciding whether to review a proposed plan, creditors have no reason to expect that the plan will address obligations other than those of the debtor itself. Under these circumstances, the imposition of a third-party release would constitute consent by ambush. An 'opt-out' approach creates an unacceptable trap for creditors having no reason to presume the inclusion of a third-party release into a plan."); *GOL Linhas*, 675 B.R. at 132 (rejecting arguments that: (i) creditors who have consented to the bankruptcy court's jurisdiction also consent to the approval of releases; (ii) class action opt-out procedures applied to the third-party releases before it; and (iii) that consent may be imputed from the failure to opt out).

72. And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See Smallhold*, 665 B.R. at 719.

73. The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *See id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

74. But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *See id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default

judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

75. "[After *Purdue*], that is no longer the case in the context of a third-party release." *See Smallhold*, 665 B.R. at 722. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *See id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *See id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See id*. at 719-20.

76. Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *See id*. at 709. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *See id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[21] Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *See id*. at 720 (emphasis added).

[21] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

77. In sum, the failure to opt out does not constitute the affirmative consent necessary to reflect unqualified acceptance by Holders of Claims or Interests to the third-party releases the Plan seeks to provide to the many so-called "Released Parties." As a result, the Debtors do not meet their state-law burden of establishing that the members of the Classes in the Plan have agreed to release their property rights and have that release memorialized in the Plan. *See Mizuna, Ltd. 90 F.3d at 658.*

78. Nothing in the Bankruptcy Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law. It is especially egregious to do so here to parties that are not entitled to vote on the Plan. The Plan's third-party releases are therefore non-consensual, and so are prohibited by *Purdue*.[22]

[22] The TDP requires any claimant wishing to have his or her claim paid by the Trust to first execute an "PI/WD Claimant Release" that includes a release of "all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or noncontingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery resulting from or in any way connected to, in whole or in part, the discharge of any Asbestos Trust Released Party's duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Plan, the formulation, reparation, negotiation, execution or consummation of the Trust Agreement, the TDP, and the Plan, and any and all other orders of the Bankruptcy Court or any other applicable court relating to any Asbestos Trust Released Party and/or the duties and responsibilities of any Asbestos Trust Released Party. For the avoidance of doubt, Released Claims under this Release and Indemnity Agreement shall not include "PI/WD Claims," or "Estate Causes of Action," as those terms are defined in the Plan." *See* Dkt. 229-2 at Section 7.6, page 26 of 27 and 229-3, page 3 of 8. The release in the TDP is also not consensual because the TDP withholds distributions from claimants who decline to execute that release. *See* TDP at Section 7.6 (a claimant shall be required to execute an PI/WD Claimant release"). This coercion to sign the release means there is not valid consent. *See, e.g., Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022) (if an offeree is penalized unless an "offer" is accepted, that "preclude[s] an inference of assent"); *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965) ("A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit.").

## III. The Debtor Release in the Plan Is Overbroad

79. The Plan provides for a release by the Debtors and their Estates to the Released Parties, which includes the Debtor Related Parties and the Related Parties. *See* D.I. 194-1 at Section 9.1, pages 36-37 of 55.

80. The Plan does not establish that each of the proposed Released Parties including the Debtor Related Parties and the Related Parties are providing adequate consideration in exchange for receiving such releases. In addition, certain persons included in the definitions of Released Parties, Debtor Related Parties, and Related Parties do not appear to be entitled to such releases under applicable case law. Many individuals and entities included in the definitions of Released Parties, Debtor Related Parties, and Related Parties are unknown parties. *See* D.I. 194-1 at Sections 1.1.26, 75, and 77, pages 10, and 15 of 55. In fact, it appears that the Debtors' current officers and directors are not only receiving an exculpation as fiduciaries for the estates, but are also receiving a release.

81. In *In re Zenith Elecs. Corp.*, the Court identified five factors that are relevant to determine whether a debtor's release of a non-debtor is appropriate:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;
>
> (2) a substantial contribution to the plan by the non-debtor;
>
> (3) the necessity of the release to the reorganization;
>
> (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and
>
> (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*See Zenith*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994). These factors are neither exclusive nor conjunctive

requirements but provide guidance in the court's determination of fairness. *See Master Mortgage*, 168 B.R. at 935 (finding there is no "rigid test" to be applied in every circumstance and that the five factors are neither exclusive, nor conjunctive).

82. The first *Zenith* factor requires an "identity of interest between the debtor and the third-party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." *See In re Spansion, Inc.*, 426 B.R. 114, n. 47 (Bankr. D. Del. 2010) (citing *Zenith*, 241 B.R. at 110). An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release. *See Wash. Mut.*, 442 B.R. at 347 (recognizing that indemnification may create an identity of interest thereby satisfying the first factor of *Zenith*). Here, it is unclear whether an identity of interest exists between the Debtors and each of the Released Parties.

83. The second *Zenith* factor involves whether the non-debtor party benefiting from the release made a substantial contribution of assets to the debtor's reorganization. *See In re Congoleum Corp.*, 362 B.R. 167, 193 (Bankr. D.N.J. 2007). In considering releases, substantial contribution does not include contributions to the reorganization related to operational restructuring or negotiating for the financial restructuring. *See In re Genesis Health*, 266 B.R. at 606-7 ("the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization."). There is scant evidence that each of the Released Parties provided a substantial contribution of assets.

84. As to the third *Zenith* factor, no information is provided to support the contention that all of the releases are necessary to a reorganization. Here, the Plan is actually a liquidation plan; so, there is no reorganization.

85. The fourth *Zenith* factor concerning acceptance of the Plan is premature and cannot be assessed at this time as the Debtors have not filed a certification of ballots.

86. The fifth *Zenith* factor is not satisfied as it does not appear that unsecured creditors will receive all or substantially all of their claims.

87. Accordingly, these factors largely do not support the Debtor Releases.

**IV. The Exculpation Provision is Overbroad**

88. The Debtors seek to exculpate the Exculpated Parties "…for (1) any act or omission in connection with, relating to, or arising out of, these chapter 11 cases from the petition date to the effective date; (2) the formulation, preparation, dissemination, negotiation, filing, or consummation of the disclosure statement or the plan; (3) the filing of these chapter 11 cases; (4) the pursuit of confirmation of the plan; (5) the administration and implementation of the plan, including providing any legal opinion requested by any person or entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the plan or the reliance by any exculpated party on the plan, the confirmation order, the issuance or distribution of securities pursuant to the plan or the distribution of property under the plan or any other agreement (whether or not such issuance or distribution occurs following the effective date); (6) negotiations regarding or concerning any of the foregoing; and (7) the administration of the plan or property to be distributed hereunder. the exculpated parties shall be deemed to have participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code." *See* D.I. 194-1 at Section 9.3, pages 38-29 of 55.

89. However, exculpation is only available for services rendered between the Petition Date and the Effective Date. *See Mallinckrodt*, 639 B.R. at 883 (holding that exculpation "only extends to conduct that occurs between the Petition Date and the effective date," and ordering

contrary language "must therefore be stricken"). As the Plan's exculpation provision would allow exculpation for conduct that occurred before the Petition Date and after the Effective Date as to (2)-(7) above, it exceeds the allowable scope of exculpation, and effectively imposes a non-consensual release of non-debtors by non-debtors in contravention of the Supreme Court's decision in *Purdue,* 144 S. Ct. at 2082-88. As such, the Plan cannot be confirmed unless the Exculpation Provision is revised to comply with applicable law. It is requested that the Exculpation Provision be revised as follows:

> "As of the Effective Date, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from, any liability to any Holder of a Claim or Interest, or any other party in interest from the petition date to the effective date, for (1) any act or omission in connection with, relating to, or arising out of, these chapter 11 cases ~~from the petition date to the effective date~~; (2) the formulation, preparation, dissemination, negotiation, filing, or consummation of the disclosure statement or the plan; (3) the filing of these chapter 11 cases; (4) the pursuit of confirmation of the plan; (5) the administration and implementation of the plan, including providing any legal opinion requested by any person or entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the plan or the reliance by any exculpated party on the plan, the confirmation order, the issuance or distribution of securities pursuant to the plan or the distribution of property under the plan or any other agreement (whether or not such issuance or distribution occurs following the effective date); (6) negotiations regarding or concerning any of the foregoing; and (7) the administration of the plan or property to be distributed hereunder. the exculpated parties shall be deemed to have participated in good faith in connection with the above and entitled to the protection of section 1125(e) of the Bankruptcy Code. Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the plan."

## V. The Injunction Provisions in the Plan are Overbroad and Impermissible

90. This Court also may not approve the injunctions enforcing the third-party release by barring claims against non-debtors. Purdue held that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue*, 603 U.S at 227. As the Purdue court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies pursuant

to section 524(g) of the Bankruptcy Code. *See id.* at 222 (citing 11 U.S.C. § 524(g)). Although these cases are asbestos-related bankruptcies, the Debtors chose not to pursue a plan under section 524(g).

91. Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction. An injunction is critically different from a consensual non-debtor release. The legal effect of a consensual release is based on the parties' agreement. *See Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change. An injunction, by contrast, relies on the court's power to enter orders binding on parties. The court must therefore have both constitutional and statutory authority to enter an injunction. And, once such jurisdiction and authority are established, the court still must determine that an injunction is warranted.

92. Here, not only are the Debtors seeking an injunction enjoining all entities who have held, hold, or may hold claims, interests, causes of action, or liabilities that are subject to compromise and settlement pursuant to the Plan, have been released pursuant to the Plan, are subject to the exculpation pursuant to the plan or are otherwise satisfied, stayed, released, or terminated pursuant to the Plan, the Debtors are also seeking an injunction enjoining all persons that have held or asserted, that hold or assert, or that may in the future hold or assert any cause of action against any insurance company. *See* Dkt. 194-1 at Sections 9.4 and 9.5, pages 39-42 of 55.

93. This Plan is a liquidating plan and, as such, the Debtors will not be receiving a discharge pursuant to section 1141 of the Bankruptcy Code. *See* Dkt. 194-1 at Section 9.10, page 44 of 55. However, the language included in the injunctions acts as a discharge.

## VI. The Plan Has an Improper Gatekeeping Injunction

94. The Court should deny confirmation because Section 9.4 of the Plan has an improper gatekeeping injunction.

95. Section 9.4 of the Plan would give this Court exclusive jurisdiction to "determine whether a cause of action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable cause of action." *See* D.I. 194-1, Section 9.4, page 40 of 55.

96. The above provisions would force a claimant who wishes to pursue a claim or cause of action against the Debtors, the Exculpated Parties or the Released Parties to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed. By specifying that this Court shall determine whether a claimant can proceed, the Plan's gatekeeping injunction effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action. The gatekeeping injunction would apply even after the Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

97. The Plan's gatekeeping injunction is improper because the bankruptcy court lacks jurisdiction and statutory authority to enter such an injunction, and there has been no showing that injunctive relief is warranted. *See In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 359-362 (5th Cir. 2025) (bankruptcy courts "do not have unrestricted power to protect non-debtors from liability via a pre-filing injunction" and holding that injunction be limited to and coextensive with

definition of exculpated parties) (*cert. petition filed* Jul. 28, 2025, Case No. 25-119 (S. Ct.)); *Resorts Int'l Fin., Inc. v. Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 168 (3d Cir. 2004) ("As stated, the jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan."); *Bank of Louisiana v. Craig's Stores of Texas, Inc.* (*In re Craig's Stores of Texas, Inc.*)*,* 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan"; *In re AIO US, Inc,* 677 B.R. 509, 564 (Bankr. D.Del. 2025) (striking the proposed gatekeeper injunction, while observing that while the bankruptcy court "retains jurisdiction to resolve a dispute about the meaning of its order . . .the better view is that it ought not assert exclusive jurisdiction over that issue." (emphasis in original).

98. In addition, the gatekeeping injunction contravenes the basic premise that once a company confirms a plan it "is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens." *See In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (cleaned up). Gatekeeping would create inefficient piecemeal litigation contrary to the purpose of "related to" jurisdiction. *See Matter of Zale Corp.*, 62 F.3d 746, 752 (5th Cir. 1995) ("[W]hen we define 'related to' jurisdiction, we should avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate.") (cleaned up). Parties would have to go to the bankruptcy court for permission to sue, then to the court where they want to sue to file the complaint, and then back to the bankruptcy court again if they want to amend the complaint, then back to the court presiding over the suit if the bankruptcy court allows the amendment. That makes no sense. It increases the burden on the courts, imposes unnecessary

costs and delay on the parties, and unnecessarily interferes with other courts' jurisdiction and ability to manage the cases before them. *See Zale*, 62 F.3d at 755 ("[C]ourts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes.") (cleaned up). There is no reason to deviate from the ordinary course in which the court presiding over a lawsuit determines whether the claims are "colorable," adjudicates any defenses, including the defense of release, and determines whether any amendments to the complaint should be permitted.

99. A similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *See Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

100. In light of the foregoing, the gatekeeping injunction should be stricken from the Plan. At the very least, this Court should not have to decide whether a claim is colorable, only whether the releases and exculpations apply.

**VII. The Court Should Not Waive the Stay Under Rule 3020(e)**

101. The Plan provides the following request for waiver of the 14 day stay: "[t]he terms of this Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Administrator, the Trust, the Holders of Claims and Interests, the Released Parties, the Exculpated Parties, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and all parties in interest.." *See* D.I. 194-1 at Section 12.2, page 49 of 55.

102. The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." *See* Fed. R. Bankr. P. 3020(e). The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *See id.*

103. Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review. *See In re Chemtura Corp.*, No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010). Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay. *See id.*; *see also In re Adelphia Comm. Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").

104. "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *see In re Syncora Guarantee Inc.*, 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

105. Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review. The Court should thus deny their request to waive Rule 3020(e)'s stay.

## VIII. The Statutory Fee Provision Must be Revised in the Plan

106. Section 2.3 of the Plan provides for the payment of statutory quarterly fees pursuant to 11 U.S.C. § 1930(a)(6). *See* D.I. 194-1 at Section 2.14, page 20 of 55. The language in the Plan provides that U.S. Trustee Fees will be paid by the Debtors on the Effective Date and that the Debtors or the Plan Administrator would be responsible for paying U.S. Trustee fees post-Effective Date. *See id.*

107. The U.S. Trustee requests the language contained in Section 2.3 be revised as follows:

> All U.S. Trustee Fees due and payable prior to ~~On~~ the Effective Date~~,~~ shall be paid by the Debtors in full in Cash ~~shall pay all U.S. Trustee Fees that are due and owing as of~~ on the Effective Date. On and after the Effective Date, ~~Nothing in the Plan shall release~~ the Debtors, the Trustee, and ~~or~~ the Plan Administrator shall be jointly and severally liable for ~~and from their obligation to~~ paying any and all U.S. Trustee Fees in full in Cash when due and payable in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Cases being ~~arising from and after the Effective Date before a Final Order is entered by the Bankruptcy Court~~ closed~~ing~~, dismissed~~ing~~ or converted~~ing~~ to a case under ~~the~~ Chapter 7~~11 Cases~~ of the Bankruptcy Code. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, the Trustee, and the Plan Administrator shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) t~~T~~he U.S. Trustee Fees are Allowed; (ii) the U.S. Trustee shall not be treated as providing any release under the Plan ~~regarding the U.S. Trustee Fees.~~; and (iii) ~~T~~the U.S. Trustee shall not be required to file any Proof of Claim or any other request(s) for payment with respect to ~~administrative expense for~~ U.S. Trustee Fees. ~~The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due. After the Effective Date, the Plan Administrator will file with the Bankruptcy Court all quarterly post-confirmation reports when they become due.~~

## IX. Deemed Acceptance Provision

108. Section 3.8 of the Plan provides that a class will be deemed to accept the Plan if no votes are cast and the class contains claims or interests eligible to vote: "If a Class contains Claims

eligible to vote, and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of Claims in such Class shall be deemed to have accepted the Plan." *See* D.I. 194-1 at Section 3.8, page 22 of 55.

109. The Debtors do not provide any basis under the Bankruptcy Code, Bankruptcy Rules or case law that supports this provision. As such, the provision should be removed from the Plan. Such provision may not be material based on the voting but the Debtors have not filed a voting certification as of the date of this Objection.

**X. Dissolution and Release of the Committee**

110. Section 12.11 of the Plan provides the Committee will dissolve on the Effective Date subject to serving and functioning in limited circumstances after the Effective Date. *See* D.I. 194-1 at Section 12.11, page 49 of 55. In addition, pursuant to Section 12.11 if the Plan, the Committee and its professionals are receiving a separate release and discharge of all rights and duties from, or related to, these cases.[23] *See id.* It further appears that the Committee is listed as a Released Party under the Plan. *See* D.I. 194-1 at Section 1.1.77, page 15 of 55.

---

[23] Section 12.11 of the Plan states as follows:

> On the Effective Date, the Committee will dissolve. Upon the dissolution of the Committee, the Committee and its respective Professionals shall cease to have any duty, obligation, or role arising from, or related to, these Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, these Chapter 11 Cases. Notwithstanding the foregoing, the Committee may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Effective Date for the purposes of participating in any (1) appeal of any order entered in these Chapter 11 Cases, including the Confirmation Order, (2) applications for compensation or expense reimbursements of Professionals and any hearing thereon, or (3) adversary proceeding pending on the Effective Date to which the Committee was a participant. To the extent that the Committee determines to continue to serve and function after the Effective Date pursuant to the preceding sentence, it will dissolve upon the completion of its participation in the matters described in clause (1) through (3), as applicable. Effective as of the dissolution of the Committee, the Trust will succeed to, and exclusively hold, the attorney-client privilege and any other privilege held by the Committee and shall enjoy the work product protections that were applicable or available to the Committee before its dissolution.

*See* D.I. 194-1 at Section 12.11, page 49 of 55.

111. The Committee and its members act as fiduciaries for the estates. As fiduciaries, the Committee and its members are entitled to an exculpation for actions or inactions occurring from the Petition Date to the Effective Date of the Plan.

112. Here, it appears that the Committee and perhaps its members are receiving a release instead of an exculpation. As the Committee and its members should only be entitled to an exculpation for their actions or inactions from the Petition Date to the Effective Date of a Plan, Article 12.11 should simply dissolve the Committee and allow the Committee limited standing post-Effective Date. In addition, the Committee should be removed as a Released Party under Section 1.1.77 of the Plan and be added as an Exculpated Party under Section 1.1.37 of the Plan.

113. In addition, no information is provided in the Plan concerning the Retiree Committee.

**XI. The Plan, the Trust, and the TDP May Not Protect Future Claimants**

114. Under section 1129 of the Bankruptcy Code, a plan may be confirmed only if the Court finds that it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). In making this determination, the Court's role is "not merely . . . ministerial," but rather involves close "scrutiny of the circumstances" surrounding a plan. *See American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 146 (1940); *accord In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002) (explaining that the court's section 1129(a)(3) determination "is based on the totality of the circumstances"). Relevant facts include any potential impropriety of which the court is aware, no matter whether it appears on the face of the plan. *See, e.g., In re Mann Farms, Inc.*, 917 F.2d 1210, 1215 (9th Cir. 1990) (considering and rejecting claim that a plan violated section 1129(a)(3) because "the bankruptcy court action is a ploy" to prolong a state tort suit).

115. Here, the Plan is generally typical of those filed in asbestos-related chapter 11 cases. It appears that all present and future asbestos claims will be channeled to a trust (the "Trust") for processing and payment. The operative documents for the Trust are in exhibits to the Plan, which are contained in the Plan Supplement: (i) the Trust Agreement (Attachment 1 to the Plan Supplement) provides that the Trust will be managed by a trustee appointed and overseen by a Trust Advisory Committee ("TAC"), consisting of representatives of the same law firms on the Committee; and (ii) the Trust Distribution Procedures (Attachment 2 to the Plan Supplement) (the "TDP") set forth the specific procedures that the Trust will employ when processing, reviewing, and paying claims, including the evidence that each claimant must submit and the formulas that will determine the actual payment to be made to each claimant.

116. However, the atypical aspect of the Plan is that it is not filed pursuant to section 524(g) and that the Trust is not a 524(g) trust. As such, it is unclear how the Debtors will be able to bind future claimants to the terms of the Plan. Had a 524(g) trust been proposed at the outset of these cases, a legal representative would have been selected to represent future claimants. As such, future claimants were not represented during these cases, did not take part in the pre-petition negotiations leading to the amount to be included in the Trust, and did not take part in the postpetition negotiations concerning the terms of the Trust and the TDP.

117. In addition, pursuant to the Trust and TDP, a Trust Advisory Committee will be formed to oversee the Trustee. However, there will be no representative of future claimants overseeing the Trust as is typical in other asbestos trusts. As such, it does not appear that future claimants were protected prior to the bankruptcy filing or during the bankruptcy cases, and will not be protected post-confirmation.

## XII. The TDP Should be Revised to Include a Document Retention Policy

118. The TDP should be revised to include a defined document retention policy. The inclusion of such a policy will most likely deter future litigation should the Trustee seek to destroy documents. The following language is proposed to be included in the TDP: "The Trustee, with the consent the TAC, will adopt a document retention policy that complies with all applicable law within one year of the Effective Date (as it may be amended, the "Document Retention Policy"). The Document Retention Policy may be subsequently amended by the Trustee with the consent of the TAC. A copy of the Document Retention Policy will be included on the website maintained by the Trust."

## CONCLUSION

WHEREFORE, the U.S. Trustee respectfully asks that this Court deny confirmation and grant such other relief as the Court deems fair and just.

Dated: October 29, 2026
Newark, New Jersey

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 & 9**

By: */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ 07102
(973) 645-3014 (Phone)
jeffrey.m.sponder@usdoj.gov